UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                        :

UNITED STATES OF AMERICA,            :

                                         :

          v.                             :        **MEMORANDUM AND ORDER**
                                         :        25-CR-40 (WFK)

JUAN VILLAR,                        :

                                       :

                 Defendant.       :
-----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On June 16, 2025, Defendant pled guilty to one count of conspiracy to receive stolen property, in violation of 18 U.S.C. § 371, charged under a four-count Indictment. *See* Plea Agreement (the "Plea") at ¶ 1, ECF No. 55; *see generally* Indictment, ECF No. 1.[1]  The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a).  For the reasons set forth below, Defendant is hereby sentenced to forty-six (46) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, ECF No. 81; and a $100.00 mandatory special assessment.

## I.      Background

### *Factual Background*

While operating the New York City pawn shop Big Apple General Buyers ("Big Apple") between November 2020 and January 2025, Defendants Juan Villar ("Defendant") and Dimitry Nezhinskiy ("Nezhinskiy") conspired together and with South American Theft Groups (the "SATGs") "to receive, possess, conceal, store, barter, sell, and dispose goods, merchandize, and money, of the value of $5,000 or more."  Presentence Investigation Report (the "PSR") at ¶¶ 2, 6, ECF No. 68.

To serve as the SATGs' fence, Defendants coached the groups as they "traveled across the United States engaging in crime tourism [and] committing burglaries" by "targeting jewelry

---

[1] Citations are to the docket in *United States v. Nezhinskiy, et al.*, 25-CR-40. Pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

vendors or wealthier neighborhoods, including the homes of various prominent athletes." *Id.* at ¶¶ 6–7; *see also Fence, Black's Law Dictionary* (12th ed. 2024) (A "fence" is "[s]omeone who receives stolen goods, [usually] with the intent to sell them in a legitimate market"). Although Defendants did not recruit any SATGs, "smaller fences and other SATG[s] referred SATG[s] to [Big Apple]" given Defendants' ability "to purchase upwards of $300,000 in stolen goods in a single transaction" and pay with cash. PSR at ¶ 8.

The SATGs proceeded to take "any high-end items they could potentially resell[,]" and were further instructed by Defendants "to steal items outside of New York to make it easier for [Defendants] to resell and harder for law enforcement to trace." *Id.* at ¶ 7. As a result of Defendants' preference for out-of-state theft, the items "crossed a State or United States boundary after being stolen, unlawfully converted, or taken[.]" *Id.* at ¶ 2; Indictment at ¶ 1, ECF No. 1. The stolen goods identified as part of Defendants' scheme can be categorized as follows: Jewelry, watches, handbags, and miscellaneous luxury items. *See* PSR at ¶ 2.

Nezhinskiy remained "the main point of contact for [the] SATG[s]" throughout the scheme while Defendant "served as the backup." *Id.* at ¶ 9. To avoid detection, "Nezhinskiy met [the] SATG[s] at alternate locations and made transactions outside of [Big Apple]." *Id.* Meanwhile, Defendant would "purchas[e] stolen goods within [Big Apple]," but he remained "aware of the scope and structure of the fencing operation." *Id.*

At least six separate burglaries were conducted by SATGs across the United States and prior to Defendants' arrests. *See id.* at ¶¶ 11–12. At least five of the SATGs' "theft crimes across the United States between 2020 and 2025" involved Defendants' operation. *Id.* at ¶ 12. However, only Nezhinskiy was in contact with "at least two members of a four-man burglary crew involved in the December 9, 2024, burglary of a high-profile athlete in Ohio." *Id.* at ¶ 11.

2

Nezhinskiy spoke with the crew members "less than a week prior to the commission of the burglary," and Probation does not indicate Defendant was in contact with this specific burglary crew. *Id*. at ¶ 11.

Defendants' criminal activity was discovered when "law enforcement utilized undercover officers" between October 2022 and January 2024 to "conduct[] controlled sales of purported stolen property, including high end handbags and luxury accessories, to either Nezhinskiy or [Defendant], or both, at [Big Apple]." *Id*. at ¶ 10. Evidence exists documenting Defendants' "recei[pt] [of] at least $2,595,798.19 worth of stolen property" between December 2020 and February 2023. *Id*. at ¶ 14.

### *Procedural History*

On February 4, 2025, the Federal Bureau of Investigation arrested Defendant at Big Apple. *See id.* at ¶ 18. While executing both an arrest and search warrant, law enforcement found "large quantities of stolen property including dozens of high-end watches and jewelry, large quantities of cash, and marijuana." *Id*. at ¶ 13. Following Defendant's arrest, additional stolen goods were discovered in storage units belonging to the Defendants in New Jersey. *See id.*

On January 30, 2025, a U.S. Grand Jury returned an Indictment asserting four counts: Count One against Defendants alleged conspiracy to receive stolen property in violation of 18 U.S.C. § 371; Count Two against Defendants alleged receipt of stolen property in violation of 18 U.S.C. § 2315; and Counts Three and Four against Nezhinskiy alleged receipt of stolen property in violation of 18 U.S.C. § 2315. *See* Indictment at ¶¶ 1–5. The Indictment also raised criminal forfeiture allegations pertaining to all counts. *See id.* at ¶¶ 6–7.

3

On June 16, 2025, Defendant pled guilty to Count One of the Indictment, charging him with conspiracy to receive stolen property from November 2020 to January 2025 in violation of 18 U.S.C. § 371. *See* Plea at ¶ 1; *see also* Indictment at ¶¶ 1–2. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposed a term of sixty (60) months' incarceration or below. Plea at ¶ 4. The Government agreed "no further criminal charges [would] be brought against [Defendant] for conspiring to and actually receiving and possessing stolen property between November 2020 and February 2025." *Id.* at ¶ 5. Additionally, the Government agreed to dismiss Count Two of the Indictment with prejudice as to Defendant at the time of sentencing. *See id.*

On July 18, 2025, Nezhinskiy pled guilty to Count One of the Indictment. Nezhinskiy Plea Agreement at ¶ 1, ECF No. 63. He is scheduled to be sentenced on Monday, March 23, 2026. *See* Scheduling Order, ECF No. 67.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the United States Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state—in open court—the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines

4

range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

### III. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

#### 1.    *Family and Personal Background*

Defendant was born on January 22, 1977, in Queens, New York, to the union of his father, Juan Carlos Villar, Sr., and his mother, Carmen Rosa Villar (née Urquiza). *See* PSR at ¶ 45. Defendant's father passed away in 2001 after suffering a heart attack. *See id.* Prior to his passing, Defendant's father "did odd jobs, which involved being a supply manager at a restaurant, operating a car delivery service for car auctions, and co-owning a bar (with his mistress)." *Id.* Defendant's mother "is a retired accountant and professional gift wrapper." *Id.*

Defendant was previously married to Noris Mercedes Sabogal ("Sabogal"). *See id.* at ¶ 49. Defendant and Sabogal were married "in either 2000 or 2001," and divorced on October 5, 2010, due to Defendant "not giv[ing] her attention" because "he was young, foolish, and making a lot of money." *Id* (internal quotation marks omitted). Sabogal is forty-six years old and presently lives in Florida where she is employed as a nurse. *See id.* Defendant married Daphne Z. Kohavy ("Kohavy") on December 4, 2013, and the couple share one eleven-year-old son named Ariel Kohavy Villar ("Ariel"). *See id.* at ¶ 50. Kohavy is forty-six years old, lives in Queens, New York, and works as a teacher. *See id.*

Defendant and his mother reportedly suffered abuse "at the hands of his father," who had a history of drug use and was "subsequent[ly] arrest[ed] and incarcerat[ed] for narcotics." Defendant's Sentencing Memorandum ("Def's Sent'g Mem.") at 2–3, ECF No. 77; *see also* PSR at ¶¶ 45, 47. Defendant believed the impetus for his father's abusive conduct was the physical abuse his father sustained from Defendant's maternal grandmother. PSR at ¶ 47. Defendant's father "used to slap and kick at [Defendant], and when [Defendant] made mistakes, [his] father asked [him] why he was stupid before slapping him across the face, causing [Defendant] to bleed from his lip." *Id* (internal quotations marks omitted). Defendant also reported witnessing "his mother bleed from her nose as a result of [his] father physically abusing her" when he was seven or eight years old. *Id.* His father had a history of abusing both cocaine and alcohol—which Defendant witnessed on family vacations alongside finding drug paraphernalia in their home— and was sentenced to fifty months' incarceration for a narcotics-related offense in the United States District Court for the District of Massachusetts. *See id.* at ¶¶ 45, 47. After release from custody, Defendant's father "relocated to Florida to escape negative influences in New York." *Id.* at ¶ 47.

Defendant "was primarily reared by his mother" as "[a] lifelong resident of Queens." *Id.* at ¶ 47.  Defendant described his mother as a "good role model." *Id.*  His mother is now eighty years old and "lives alone at the address of record in Queens." *Id.* at ¶ 45.  She is in poor health, suffering from "high cholesterol, hypertension, and diabetes." *Id.*  Additionally, his mother suffered a fall on or around March 2025 which resulted in hip replacement surgery, rehabilitation, and now ambulation with a walker. *See id.*  In late November and early December 2025, Defendant's "mother suffered from multiple miniature strokes, resulting in her ongoing hospitalization through at least December 10, 2025." *Id.*

During Defendant's marriage to Kohavy, Defendant "alternated between living with his mother and living with his wife." *Id.* at ¶ 50.  Defendant states he was the "full-time caretaker for his mother" prior to his arrest, given "his wife does not have a good relationship with his mother" and therefore "does not involve herself in being present for [Defendant's] mother." Def's Sent'g Mem. at 7; PSR at ¶ 45.

Defendant disclosed he was "the victim of sexual abuse as a child" which was perpetrated by his childhood friend's older brother.  PSR at ¶ 48.  He believes the abuse "affected his experience with relationships . . . in a negative manner, such that it caused [Defendant] to feel he was being taken advantage of by others to develop feelings of mistrust in them." *Id.*; Def's Sent'g Mem. at 3.  This physical and sexual abuse was confirmed by Defendant's wife and further confirmed by treatment Defendant received from the Manhattan-based Crime Victims Treatment Center. *See* Def's Sent'g Mem. at 3; *see generally* PSR at ¶ 48 (indicating Kohavy knew of the sexual abuse Defendant faced).

Defendant reported Kohavy is "barely" able to provide for their son Ariel, who was diagnosed with "attention deficit hyperactivity disorder (ADHD) and, because of [Defendant's]

7

instant arrest" has "missed a scheduled psychological evaluation, which he has not [yet] made up." PSR at ¶ 50. There are reports Ariel has been "shutting down at school and has stopped participating in events at school and after school programming, such as sports." *Id* (internal quotation marks omitted).

Kohavy stated she was shocked to learn of Defendant's instant arrest and described him as "selfless" and "hard working[.]" *Id.* at ¶ 51. She also stated Defendant was a good father and a good son. *Id.* Defendant reported a good relationship with his mother who is aware of his involvement in the instant offense but nonetheless remains supportive of him. *Id.* at ¶ 45. Defendant has a paternal half-brother named Roberto Greco ("Greco"). *See id.* at ¶ 46. However, Defendant "does not have much of a relationship with him and has only conversed with him by phone a few times." *Id.* Greco is reportedly between sixty and seventy years old. *See id.*

Family members and friends have written letters in support of Defendant, including his mother, his mother-in-law, and his sister-in-law. *See* Def. Sent'g Mem., Ex. A.

2.      *Educational and Employment History*

Defendant earned his high school diploma from Forest Hills High School on January 31, 1997. *See* PSR at ¶ 61. Defendant achieved "a cumulative academic average of 65.39%" and had "no disciplinary records on file[;]" if Defendant had any disciplinary records, the school advised the records "were expunged upon his graduation on January 31, 1997." *Id.* Defendant reported attending night classes at Jamaica High School in Queens during unspecified dates in the 1990s. *See id.* at ¶ 62.

Defendant's first record of employment was as a stockman and stationary store worker at numerous businesses. *See id.* at ¶ 67. "From the mid-1990s through early 2000s, [Defendant]

worked as a bail bondsman." *Id.* Defendant would return to working as a bail bondsman after leaving work as "a clerk and salesman at a luxury car dealership." *Id.* From some unspecified period between Defendant's work as a bail bondsman and luxury car salesman, Defendant also "tried but was unsuccessful at being a real estate contractor." *Id.* Income from these numerous employment opportunities was not reported. *See id.*

From 2012 to 2016, Defendant was a manager at Marvin's Bail Bond in Bronx, New York. *See id.* at ¶ 66. Defendant reported "earn[ing] $1,000[.00] each week." *See id.* "He withdrew himself from this company" to begin work at the Elite Bail Bond Agency "due to issues with customer complaints and collateral returns related to [Marvin's Bail Bond] taking too long to return money to its customers." *Id.*

Defendant was also a manager at Elite Bail Bond Agency for two years, where he "handled business paperwork and maintained contact with defendants on bond." *Id.* Defendant "earned between $3,000[.00] and $5,000[.00] each month." *Id.* at ¶ 65. Defendant was let go from the company in 2018 "because of the collateral financial consequences that bail reform in New York City had on this business and the bail bonds industry" in general. *Id.*

Defendant's last record of employment prior to his arrest was as the sole owner of Big Apple, the business referenced in the instant case, which was established in October 2018 and located in the Diamond District of Manhattan, New York. *See id.* at ¶ 64. Defendant "stated he earned between $60,000[.00] and $100,000[.00] annually, and this business earned as much as $5,000,000[.00] (gross) on average each year." *Id.* Defendant's employment naturally halted upon his arrest pursuant to the instant offense conduct on February 4, 2025. *See id.*

3.    *Prior Convictions*

Defendant has two adult criminal convictions prior to the instant case. On January 1, 2001, Defendant was arrested after "us[ing] a metal flashlight to strike a male victim in the head multiple times and break the . . . glass front door" of "the Bora Bora Club on Steinway Street in Queens, New York." *Id.* at ¶ 37. "The victim required seven stitches to close his laceration, and the damage to the . . . door exceeded $250[.00]." *Id.* The Queens County Criminal Court convicted Defendant of assault in the third degree, a Class A misdemeanor. *See id.* Defendant was sentenced to one-year conditional discharge on February 28, 2001. *See id.* On April 7, 2005, a certificate of relief was issued in the case. *See id.*

On March 16, 2009, Defendant was arrested after "submitt[ing] a false bail bond" in the New York County Supreme Court. *Id.* at ¶ 38. The New York County Supreme Court charged Defendant with offering a false instrument to file in the first degree, a Class E felony. *See id.* On July 8, 2009, Defendant was sentenced to six months' custody and five-years of probation. *See id.* On August 27, 2013, Defendant was discharged early from probation. *See id.* On October 15, 2014, a certificate of relief was issued in the case. *See id.*

4.    *Physical and Mental Health*

Defendant reported "he has high cholesterol, a fatty liver, and an enlarged prostate" which precipitates "lower urinary tract symptoms." *Id.* at ¶ 55–56. Additionally, Defendant is prediabetic and suffers from hyperlipidemia, or "high levels of fat in the blood." *See id.* at ¶ 56.

During the course of his detention at the Metropolitan Detention Center Brooklyn ("MDC"), Defendant suffered an accident on October 14, 2025, and was hospitalized for an unrelated event on October 23, 2025. *See id.* at ¶ 57. On October 14, 2025, Defendant "lost his grip while climbing down from his bunkbed and hit his head on a metal ladder." *Id.* Defendant

10

"complain[ed] of intermittent ringing and hearing loss in his right ear" following the accident. *Id.* When "trace amounts of dry blood [was] found in his inner right ear," Defendant "was examined and found to have . . . a ruptured tympanic membrane in his right auditory canal." *Id.* Defendant was "referred for a supplemental evaluation with an . . . ear, nose, and throat . . . doctor." Separately, on October 23, 2025, Defendant was sent to Brooklyn Hospital because of a "longstanding history of prediabetes . . . intermittent hematuria (blood in the urine), prostate enlargement, [and] significant frequency nocturia (the need to urinate at night)." *Id.*

Defendant "takes 81 milligrams of baby aspirin as a preventative measure" given a family history of heart-related issues. *Id.* at ¶ 55. Medical records from MDC report Defendant is also prescribed two medications "to be taken once daily": (1) 0.40 milligrams of tamsulosin hydrocholoride following his hospitalization for "treat[ing] enlarged prostates and assist[ing] with easier urination"; and (2) 10.00 milligrams of atorvastatin for "reduc[ing] fat in the blood and prevent[ing] heart disease." *Id.* at ¶ 56.

Defendant did not report any history of mental or emotional health conditions, suicidal ideation, or gambling issues. *See id.* at ¶ 58. Defendant's medical records at MDC also "do not reflect any mental or emotional health history for [Defendant]." *Id.*

However, Defendant received treatment "sometime in 2014 or 2015 at the Crime Victims Treatment Center in Manhattan," a provider of "treatment services for survivors of sexual assault." *Id.* Additionally, Kohavy reported believing Defendant had "severe anxiety." *Id.* Defendant reported he believed "he may have undiagnosed ADHD." *Id.*

11

### 5.    *Substance Abuse*

Defendant reports "a history of using marijuana, cocaine, ecstasy, and alcohol." *Id.* at ¶ 59. Defendant "believes his experience with sexual abuse caused him to abuse drugs and alcohol." *Id.*

Defendant began smoking marijuana at sixteen years old—when his friends introduced him to the drug—and continued using marijuana at one or two cigarettes daily "until the time of his arrest for the instant offense conduct." *Id.* Defendant stated he abused marijuana "to calm him down from being hyper." *Id* (internal quotation marks omitted).

Defendant abused cocaine at unspecified amounts "a couple of times per week" from 1998 to 2001. *See id* (internal quotation marks omitted). He stopped using cocaine after a negative experience while picking up Sabogal from school, where Defendant "used so much cocaine that he could not breathe." *Id.*

Defendant also used ecstasy on two "holiday weekends in 2011." *Id.* Defendant did not report continued use of ecstasy after 2011. *See id.*

Defendant "first started drinking alcohol as a high school student in 1992." *Id.* This caused Defendant to "cut class[]," which resulted in him taking night classes. *Id.* Defendant's preference for alcohol was wine as he "continued to drink alcohol into his adulthood." *Id.* Defendant reported drinking "at a rate of once or twice per month" with the intention of "black[ing] out." *Id.*

### 6.    *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

## B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. Defendants' "creat[ion of] a cash-based marketplace for stolen items . . . motivated individuals to engage in a nationwide series of burglaries and thefts" and "created a marketplace for the products of dangerous residential burglaries and retail thefts." Gov't Sent'g Mem. at 4. This "criminal conduct was serious and directly enabled others to engage in conduct that creates a substantial risk to human life." *Id.* The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

## C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to commit interstate transportation of stolen property in violation of 18 U.S.C. § 371. Plea at ¶ 1.

Defendant faces a maximum term of five years' imprisonment and no minimum term. *See* 18 U.S.C. § 371. Defendant also faces a maximum term of three years of supervised release. *See* 18 U.S.C. §§ 3583(b)(2), 3559(a)(4). If a condition of release is violated, Defendant may be

13

sentenced to up to two years of imprisonment without credit for pre-release imprisonment or time previously served on post-release supervision. *See* 18 U.S.C. § 3583(e). Defendant is eligible for a term of probation of one to five years. *See* 18 U.S.C. § 3561(c)(1). Unless extraordinary circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. *See* 18 U.S.C. § 3563(a)(2).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines." *Id.* § 3553(a)(4)(A).

The Government and Defendant stipulated to an estimated Total Adjusted Offense Level of 21 in the Plea.[2] *Id.* at ¶ 2.

The applicable provision of the United States Sentencing Guidelines ("U.S.S.G.") is § 2X1.1, which directs the Court to apply the "base offense level for the substantive offense." U.S.S.G. § 2X1.1(a). Here, the base offense level for the substantive office—receipt of stolen goods—is found in U.S.S.G. § 2B1.1, which covers, *inter alia*, forms of theft. *See* U.S.S.G. § 2B1.1. Under U.S.S.G. § 2B1.1(a)(2), Defendant has a Base Offense Level of 6. *See id*; PSR at ¶ 23; Government's Sentencing Memoranda ("Gov't Sent'g Mem.") at 3, ECF No. 78; Plea at ¶ 2.

The parties also agree certain adjustments should apply to Defendant. First, U.S.S.G. § 2B1.1(b)(1)(I) adds 16 levels because the total loss stemming from the offense—based on the

---

[2] The parties originally calculated the Total Adjusted Offense Level as 24. *See* Plea at ¶ 2. However, the parties further stipulated that the Total Adjusted Offense Level would be subject to a two-level reduction if Defendant "clearly demonstrated acceptance of responsibility," and a one-level reduction should Defendant "plead[] guilty on or before July 16, 2025." *Id.*

Government's estimates and Defendant's plea agreement—was greater than $1,500,000.00, but less than $3,500,000.00. U.S.S.G. § 2B1.1(b)(1)(I); PSR at ¶ 24; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

Second, U.S.S.G. § 2B1.1(b)(2)(A)(i) adds 2 levels because the offense involved ten (10) or more victims.[3] U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR at ¶ 25; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

Third, U.S.S.G. § 2B1.1(b)(4) add 2 levels because the offense involved receiving stolen property, and Defendant was in the business of receiving and selling stolen property. U.S.S.G. § 2B1.1(b)(4); PSR at ¶ 26; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

Fourth, U.S.S.G. § 2B1.1(b)(10)(C) adds 2 levels because the offense involved sophisticated means, and Defendant intentionally engaged in or caused the conduct constituting sophisticated means. U.S.S.G. § 2B1.1(b)(10)(C); PSR at ¶ 27; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

The parties have varying opinions on whether certain mitigation factors apply to Defendant. The parties agree a three-level reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). U.S.S.G. §§ 3E1.1(a)–(b); PSR at ¶¶ 32–33; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

The parties also agree a two-level reduction should apply because Defendant qualifies as a Zero-Point Offender pursuant to U.S.S.G. §§ 4C1.1(a) and (b). See U.S.S.G. §§ 4C1.1(a)–(b); PSR at ¶ 34; Gov't Sent'g Mem. at 3; Plea at ¶ 2.

---

[3] All parties agree ten or more victims were involved in this case, although neither Probation, the Government, or Defendant states the specific facts underlying the finding. *See* PSR at ¶ 25; *see also* Gov't Sent'g Mem. at 3; *see also* Plea at ¶ 2.

However, the parties disagree on whether a two-level reduction should apply due to Defendants role in the instant offense. Defendant argues "that pursuant to [U.S.S.G.] § 3B1.2(b), the written Plea Agreement, and the facts of the instant offense, [Defendant] is entitled to a two-level mitigating role reduction" because Defendant "only participated in a secondary, contingent capacity, did not plan or organize the conduct, recruit participants, control proceeds, or direct others, and his financial benefit was limited." Addendum to the PSR ("Add. to the PSR") at 1, ECF No. 79; *see also* Def's Sent'g Mem. at 4–7. Thus, the Defendant believes the Total Adjusted Offense Level is 21. *See* Def's Sent'g Mem. at 4–7 (noting such a position is in conformity with the Plea which sets forth a Total Adjusted Offense Level of 21); *see also* Plea at ¶ 2. The Government agrees with Defendant on the stipulation within the Plea and "inclusion of credit for a mitigating role." Gov't Sent'g Mem. at 3–4. Nevertheless, the U.S. Probation Department maintains its recommendation of a Total Adjusted Offense Level of 23 because "the Government [did] not assert any factual objections to the narrative of the PSR that would support [the] reduction[,]" and therefore the reduction is "not supported by the underlying facts." Add. to the PSR at 1; *see* PSR at ¶ 35. Probation also reminds this Court it is not bound by the Plea. *See* Add. to the PSR at 1.

Defendant's Criminal History Category is I despite having two criminal convictions. *See* U.S.S.G. § 4A1.1; PSR at ¶¶ 37–40; Gov't Sent'g Mem. at 3; Def's Sent'g Mem. at 4. Defendant's convictions are not counted for purposes of computing criminal history because the prior sentences of imprisonment (1) did not exceed one year and one month, and (2) were not

imposed within ten years of Defendant's commencement of the instant offense.  *See* U.S.S.G. § 4A1.2(e)(1)–(3); *see also* PSR at ¶¶ 37–40.

Because the parties disagree on the applicable reductions, their calculations of the applicable Guidelines range differ.  *See generally* Add. to the PSR.  Probation calculated a Total Adjusted Offense Level of 23 and a Criminal History Category of I, which results in a Guidelines range of forty-six (46) to fifty-seven (57) months' incarceration.  The Government calculated a Total Adjusted Offense Level of 21 and a Criminal History Category of I, which results in a Guidelines range of thirty-seven (37) to forty-six (46) months' incarceration.  *See* U.S.S.G. § 5A.  Defendant did not provide a specific Guidelines calculation but stipulated to a Total Adjusted Offense Level of 21 and a Criminal History Category of I in the Plea.  Plea at ¶ 2.

Probation recommends a Guidelines sentence of forty-six (46) months' incarceration followed by one (1) year of supervised release with four special conditions; mandatory restitution to be determined; and payment of a $100.00 mandatory special assessment.  Probation Sent'g Recommendation at 1, ECF No. 68–1. The Government recommends a Guidelines sentence between thirty-seven (37) to forty-six (46) months' incarceration.  Gov't Sent'g Mem. at 4.  Defense counsel recommends incarceration in the form of home confinement to Defendant's mother's residence for the duration of his unspecified sentence.  Def's Sent'g Mem. at 7.  This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission."  18 U.S.C. § 3553(a)(5).  The parties have

not drawn the Court's attention to any applicable policy statements. Finding none on its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The parties have not raised arguments regarding unwarranted sentencing disparities in this case. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of each victim's losses as determined by the Court" and consistent with 18 U.S.C. §§ 3663A and 3664. *See* Plea at ¶ 1. The U.S. Probation Department's investigation only revealed a response from one victim thus far ("Victim-1") whom "SATG members committed a robbery of . . . on October 26, 2022." PSR at ¶ 16. The jewelry stolen from Victim-1's store "was later sold to Nezhinskiy." *Id.* Victim-1's Affidavit of Loss to Probation "indicat[ed] a remaining total loss of $185,250 in lost property." *Id.*

As of the time of sentencing, no other responses have been received regarding victim losses. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety (90) days after sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

18

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to forty-six (46) months' incarceration; one (1) year of supervised release with both the standard and special conditions of supervision; restitution as set forth in the forthcoming Order of Restitution; forfeiture of items identified in the Order of Forfeiture, issued on February 12, 2026; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a)(2). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the Presentence Investigation Report and Addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: February 18, 2026
Brooklyn, New York

19